ANGELA HOSSENLOPP,                    )
                                      )
                Plaintiff,            )
                                      )
        vs.                           )      Case No. 4:15CV1229 PLC
                                      )
NANCY A. BERRYHILL,[1]                )
Acting Commissioner of Social Security, )
                                      )
                Defendant.            )

## MEMORANDUM AND ORDER

Angela Hossenlopp ("Plaintiff") seeks review of the decision of the Social Security Commissioner, Nancy Berryhill, denying her applications for Disability Insurance Benefits and Social Security Income under the Social Security Act.[2] The Court has reviewed the parties' briefs and the administrative record, including the hearing transcript and medical evidence. For the reasons set forth below, the case is reversed and remanded.

### I.     Background and Procedural History

On July 18, 2013, Plaintiff filed her applications for Social Security benefits alleging that she was disabled as of April 4, 2009 as a result of: "brain tumor, lymphoma, nodule in lung, heart issues, blackouts, bipolar, mediastinal."[3] (Tr. 171-74, 175, 177-82, 207). At the time of Plaintiff's alleged onset date, she was thirty-two years of age. (Tr. 84). The Social Security

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] The parties consented to the exercise of authority by the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (ECF No. 7).

[3] The Social Security Administration denied Plaintiff's previous applications for Social Security benefits on June 28, 2010. (Tr. 203).

Administration (SSA) denied Plaintiff's claims, and she filed a timely request for a hearing before an administrative law judge (ALJ). (Tr. 110-14, 115-19).

The SSA granted Plaintiff's request for review, and an ALJ conducted a hearing on September 3, 2014. (Tr. 35-83, 120-27). Plaintiff and her friend Johnah Roberts testified at the hearing. (Tr. 35-83). Ms. Roberts had met Plaintiff approximately four years earlier when Ms. Roberts' friend "took [Plaintiff] in." (Tr. 70). A vocational expert also testified. (Tr. 73-83).

Plaintiff testified that she worked for about one year sitting with hospice patients, but her employer fired her the previous week. (Tr. 43-45). Plaintiff explained: "I was undependable and I kept getting into it with my clients. I have anger outbursts." (Tr. 45). She submitted to the ALJ a letter from her former employer that stated Plaintiff was late "almost half the time[.]"[4] (Tr. 45). When the ALJ asked why Plaintiff was frequently late to work, Ms. Roberts answered, "The smallest things … aggravates [sic] her. She will – when her ADHD gets her confused and she can't get the medications that she need because she doesn't have Medicaid or anything . . . ." (Tr. 46). Plaintiff explained that, when she has access to medication, "they help, but they don't help 100 percent." (Id.).

Plaintiff testified that she was seeking Social Security benefits because "[e]very job that I've tried to get, I try and then I get fired or I lose my temper or – [Dr. Boyd] doesn't even want me driving because somebody will cut me off and my instinct in my head says, 'Get out and say something to them,' so I do and then they get mouthy and then I'll hit the windshield or just – she just said I put myself in danger, but I don't try to. It just happens." (Tr. 52). Plaintiff stated

---

[4] Although referenced several times at the hearing and in the record the letter from Plaintiff's previous employer does not appear in the record. According to Dr. Daryl Lindsay's psychological evaluation, Plaintiff presented "a letter from her employer [Active Angels] stating she had been fired for her behavior and outbursts with clients." (Tr. 936).

that she did not have a therapist but "whenever I was homeless and I stayed at Salvation Army they gave me a counselor that I could talk to for free."[5] (Tr. 52).

When the ALJ asked Plaintiff about her chest pains and "nodule," she explained, "I haven't gone back [to the doctor] because I haven't – my Medicaid stopped . . . ." (Tr. 56). Plaintiff stated she continued to smoke about a half-pack of cigarettes per day. (Id.). Plaintiff testified that she suffered daily headaches, for which she took Naproxen and ibuprofen. (Tr. 60).

Plaintiff testified that she was 5'8" and weighed 243 pounds. (Id.). Although she was not actively trying to lose weight, she was surprised that her weight was not decreasing because a side effect of her medication was loss of appetite and she only ate "one time a day[.]" (Id.). When the ALJ questioned Plaintiff about her sleep hygiene, she answered, "[W]hen it's time to go to sleep, I can't sleep. I have nightmares of, like, the past when I was younger and being abused and locked in a basement and then I just be up worrying about that and thinking about that and then I'll fall back asleep and have more nightmares and then I just end up staying up and then I'm tired the next day." (Tr. 61).

Ms. Roberts stated that Plaintiff could lift "[p]robably about 30 to 35 pounds." (Tr. 61). Plaintiff testified that she was able to mow the "small" front yard, but her brother mowed the backyard, because it was larger. (Tr. 62). Plaintiff did not think she could return to school because "with the anger and just, like, the little things that irk me, I don't really think I could sit in the classroom...and having to deal with the...deficit disorder, the authority problem, I just – I don't really think I can do it." (Tr. 64).

In regard to her education, Plaintiff testified "I went to a special school district. I have a learning disability so I kept getting kicked out of school for my behaviors and – my behavior and

---

[5] Plaintiff testified that the social worker's name was Mary Hall. (Tr. 52). The record does not contain treatment notes from this social worker.

3

my mouth, so then they put me in – I got suspended for 180 days . . . but they let me go to some alternative school in Brentwood, Missouri . . . . and that's how I graduated[.]" Plaintiff stated she also had difficulties with "flashbacks" and "I just like, kind of like, shut down and, like, do my own things." (Tr. 66). Plaintiff spent time in jail because she stole from a woman whose house she used to clean. (Tr. 64).

In a decision dated February 3, 2015, the ALJ applied the five-step evaluation process set forth in 20 C.F.R. §§ 404.1520(a), 416.920(a)[6] and found that Plaintiff "has not been under a disability, as defined in the Social Security Act, from April 4, 2009, through the date of this decision[.]" (Tr. 18-28). The ALJ found that Plaintiff had the severe impairments of "chest pain possibly related to asthma, feet arthritis [sic], obesity, headaches, and mental impairments sometimes characterized as mood disorder, anxiety, attention deficit hyperactivity disorder ('ADHD'), or personality disorder[.]" (Tr. 21). Additionally, the ALJ found that Plaintiff had the following non-severe impairments: sleep apnea, hypertension, hypothyroidism, and degenerative disc disease. (Tr. 21). In regard to other claimed conditions, the ALJ found that Plaintiff's "brain tumor is not a medically determinable impairment" and, while the record shows Plaintiff received treatment for lymphadenopathy, "a February 2011 scan showed a decrease in the size and number of lymph nodes." (Tr. 21).

---

[6] To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. §§ 404.1520(a), 416.920(a). Those steps require a claimant to show that he or she: (1) is not engaged in substantial gainful activity; (2) has a severe impairment or combination of impairments which significantly limits his or her physical or mental ability to do basic work activities or (3) has an impairment which meets or exceeds one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1; (4) is unable to return to his or her past relevant work; and (5) the impairments prevent him or her from doing any other work. Id.

4

After reviewing Plaintiff's medical records and Plaintiff's and Ms. Roberts'[7] testimony, the ALJ determined that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible[.]" (Tr. 26). The ALJ found that Plaintiff had the residual functional capacity (RFC) to

> perform medium work . . . where the claimant lifts or carries 50 pounds occasionally and 25 pounds frequently, stands or walks for six of eight hours during the workday, and sits for six of eight hours during the workday. The claimant's work is limited to simple, unskilled (SVP 1 or 2) work, with no public contact work, and no more than occasional and superficial contact with supervisors and co-employees.

(Tr. 23). The ALJ concluded that Plaintiff could not perform past relevant work, but that Plaintiff could perform other jobs that existed in significant numbers in the national economy and was, therefore, not disabled. (Tr. 27-28).

Plaintiff filed a request for review of the ALJ's decision with the SSA Appeals Council, which denied review on June 19, 2015. (Tr. 1-6, 8). Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the SSA's final decision. Sims v. Apfel, 530 U.S. 103, 106-07 (2000).

## II.    Standard of Review

A court must affirm an ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruze v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996) (quoting Boerst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). In determining whether the evidence is substantial, a court considers evidence that both supports and detracts from the Commissioner's decision. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th

---

[7] In his decision, the ALJ referred to Ms. Roberts' as "claimant's mother." (Tr. 18). A review of the record reveals that Ms. Roberts was not Plaintiff's mother. Rather, Ms. Roberts was a friend of Plaintiff's legal guardian, a woman whom Plaintiff called "mom."

5

Cir. 2009). However, a court "do[es] not reweigh the evidence presented to the ALJ and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reason and substantial evidence." Renstrue v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)).

"If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." Partee v. Astrue, 638 F.3d 860, 863 (8th Cir. 2011) (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). The Eighth Circuit has repeatedly held that a court should "defer heavily to the findings and conclusions" of the Social Security Administration. Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010); Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001).

### III.    Discussion

Plaintiff claims that substantial evidence does not support the ALJ's determination of her RFC because the ALJ failed to properly consider:  (1) the severe impairments of obesity and headaches;[8] and (2) the medical opinion evidence concerning Plaintiff's mental limitations. The Commissioner counters that, in formulating the RFC, the ALJ properly considered Plaintiff's severe impairments, credibility, and medical opinion evidence.

### A. Obesity

Plaintiff argues that the ALJ erred because, despite finding that her obesity was a severe impairment, the ALJ did not factor the resulting limitations into the RFC.  In response, the

---

[8] The Court notes that Plaintiff listed neither obesity nor headaches as impairments affecting her ability to work in her applications for benefits or in her disability report. (Tr. 171-74, 177-82). The Eighth Circuit has held that a claimant's failure to allege disability due to a particular condition "is significant." Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001).

6

Commissioner asserts that the ALJ properly considered Plaintiff's obesity and its effect on her RFC in compliance with SSR 02-1p, 2002 WL 34686281 (Sept. 12, 2002).

RFC is "the most [a claimant] can still do despite" his or her physical or mental limitations. 20 C.F.R. § 404.1545(a). "The ALJ should determine a claimant's RFC based on all relevant evidence including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (quoting Lacroix v. Barnhart, 465 F.3d 881, 887 (8th Cir. 2006)). The claimant bears the burden of proving disability and demonstrating his or her RFC. Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011).

The SSA recognizes that "[t]he combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately." 20 C.F.R. § 404, Subpt. P, App'x 1, § 1.00(Q). See also SSR 02–1p, 2002 WL 34686281, at *3 (Sept. 12, 2002). Thus, at all stages of the sequential evaluation process, including the RFC determination, "adjudicators must consider any additional and cumulative effects of obesity." 20 C.F.R. 404, Subpt. P, App'x 1, § 1.00(Q). However, the United States Circuit Court for the Eighth Circuit has held that "[w]hen an ALJ references the claimant's obesity during the claim evaluation process, such review may be sufficient to avoid reversal." Wright v. Colvin, 789 F.3d 847, 855 (8th Cir. 2015) (quoting Heino v. Astrue, 578 F.3d 873, 881 (8th Cir. 2009)).

At step three of the sequential evaluation process, the ALJ cited SSR 02-1P and considered whether Plaintiff's obesity qualified as a listing impairment. (Tr. 21-22). The ALJ noted that, at relevant times, Plaintiff "weighed over 244 pounds and was determined to be obese during an examination." (Tr. 22). Because the ALJ found "no other evidence in the record . . . that the claimant's obese physique aggravates the other impairments so much as to result in

listing-level severity," he concluded that her obesity, did not "alone or in combination with other impairments, meet or medically equal a listed impairment." (Id.).

The ALJ again referenced Plaintiff's obesity when formulating her RFC. (Tr. 24). Specifically, the ALJ noted that, "[i]n July 2013, the claimant weighed 244 pounds, which established obesity." (Id.). The ALJ stated: "As for the claimant's feet arthritis and obesity, the record shows conservative treatment for her feet and good musculoskeletal functioning." (Id.). The ALJ accounted for Plaintiff's obesity, in combination with her other physical impairments, by limiting her to medium work. (Tr. 23).

Although Plaintiff argues that the ALJ failed to include in the RFC limitations relating to her obesity, she does not identify any functional restrictions caused by her obesity, nor does she point to any medical evidence supporting the imposition of greater limitations. The Court finds that the ALJ properly accounted for Plaintiff's obesity when formulating the RFC. "Because the ALJ specifically took [Plaintiff's] obesity into account in his evaluation, we will not reverse that decision." Heino, 578 F.3d at 881-82.

### B. Headaches

Plaintiff claims the ALJ also erred in failing to incorporate in the RFC limitations relating to Plaintiff's severe impairment of headaches. More specifically, Plaintiff argues the ALJ improperly discounted the effects of her headaches based on his findings that the record contained no objective explanations for the headaches and Plaintiff received minimal treatment for them. The Commissioner counters that the ALJ properly considered the evidence when formulating the RFC.

At the hearing, Plaintiff testified that she suffered headaches daily and took Naproxen and ibuprofen, which "helps." (Tr. 59-60). Her medical records reflect that she complained of

headaches at her first appointment with Dr. Danessa Brown, her primary care physician, on April 29, 2010. (Tr. 864). Plaintiff also reported headaches at doctor appointments and ER visits in June 2010, July 2010, October 2010, November 2010, December 2010, December 2011, and August 2012. (Tr. 864, 844-49, 487-504, 829, 818, 800-05, 794, 788-93, 548, 663-65). However, Plaintiff's records reflect that she was "negative" for headaches in August 2010, September 2010, January 2011, February 2011, March 2011, April 2011, May 2011, April 2012, May 2012, July 2012, May 2013, and July 2013. (Tr. 856, 507, 835, 527, 778, 771-76, 767, 760, 754-55, 434, 737, 746, 460, 729, 693, 686). CT images of Plaintiff's head revealed no abnormalities in July 2010 and December 2010. (Tr. 492, 879).

In his decision, the ALJ wrote: "[T]he record shows minimal headache treatment and no abnormalities that would cause headaches." (Tr. 24). The ALJ noted that, in June 2010, Plaintiff's headaches "were described as 'intermittent'" and a "December 2010 head scan was normal other than an incidental arachnoid cyst." (Id.). Finally, the ALJ observed that, "[d]espite the fact that [Plaintiff] was a frequent visitor to the emergency room, she was not hospitalized with symptoms related to headaches." (Id.).

The ALJ properly considered Plaintiff's testimony and the medical evidence of record in making the RFC determination. Plaintiff neither cited functional limitations imposed by her doctors nor identified the types of limitations her headaches allegedly caused. Furthermore, Plaintiff's testimony and medical records suggested that conservative treatment controlled her headaches. See Buford v. Colvin, 824 F.3d 793, 797 (8th Cir. 2016). "If an impairment can be controlled by treatment or medication, it cannot be considered disabling." Wildman v. Astrue, 596 F.3d 959, 965 (8th Cir. 2010) (quoting Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004)). Because the ALJ's RFC determination is consistent with the type and level of treatment

Plaintiff sought and received, her physicians' medical observations, and the results of medical testing, substantial evidence in the record supports the ALJ's RFC finding.[9]

## C. Mental RFC

In her final argument, Plaintiff claims substantial evidence does not support the ALJ's determination of her mental RFC. More specifically, Plaintiff asserts that the ALJ improperly weighed the medical opinion evidence and based the mental RFC determination on his own inferences, Plaintiff's lack of mental health treatment, and his observations of Plaintiff during the hearing. In response, the Commissioner contends that the ALJ properly evaluated the evidence regarding Plaintiff's mental health and substantial evidence supported the mental RFC determination.

An RFC determination is to be "based on all the relevant medical and other evidence in [the] record." 20 CFR § 404.1520(e). This includes medical records, observations of treating physicians and others, and an individual's own description of his or her limitations. McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000). Unless the ALJ assigns controlling weight to a treating physician's opinion, the ALJ must explain the weight given to every medical opinion of record, regardless of its source. See 20 C.F.R. §§ 404.1527(c), (e)(2)(ii); 416.927(c), (e)(2)(ii). The opinions of non-examining and non-treating physicians generally do not constitute

---

[9] Plaintiff suggests that the ALJ erred in failing to ascribe particular limitations to the severe impairments of obesity and headaches. However, Plaintiff cites no authority for the proposition that an ALJ must specify a claimant's limitations on a condition-by-condition basis. Addressing a similar argument, the United States District Court for the Western District of Missouri explained: "This [lack of supporting authority] is unsurprising: doctors do not offer such opinions. They offer opinions based on their patient's condition as a whole, and the ALJ is similarly required to assess a claimant's RFC based on all of the limitations found to exist regardless of the medical cause for those limitations." Dean v. Astrue, No. 11-0001-CV-W-ODS, 2011 WL 3837963, at *5 (W.D. Mo. Aug. 29, 2011).

substantial evidence on which an ALJ can assess an RFC. See Jenkins v. Apfel, 196 F.3d 922, 925 (8th Cir. 1999).

In her disability report, Plaintiff stated that she attended special education classes from the 1980s through 2000, when she graduated from the Special School District of St. Louis. (Tr. 206-19). Plaintiff most recently worked part time as a home health aide for hospice patients, but her employer fired her because "they said I was undependable and I kept getting into it with my clients. I have anger outbursts." (Tr. 52, 220).

In her function report, dated August 2, 2013, Plaintiff stated that she lived with her "mother,"[10] who prepared meals and "usually does all the cleaning." (Tr. 194). Plaintiff stated that she tried to limit her driving "because of blackouts w[ith] headaches." (Tr. 194). Plaintiff stated that she had: difficulty getting along with family, friends, and authority figures; a "very short attention span"; and problems completing tasks, concentrating, and following instructions. (Tr. 195-96). Plaintiff noted that her hobbies included walking and playing volleyball, and she "sometimes go[es] to church with friends." (Tr. 195).

Plaintiff's legal guardian, Dawn Rashad, completed a third party adult function report for Plaintiff on January 12, 2015. (Tr. 269-80). Ms. Rashad defined her relationship to Plaintiff as "Godmother/legal guardian." (Tr. 269). Ms. Rashad wrote that Plaintiff's medication "makes her very drowsy, she sleeps a lot, would be unsafe for her to operate a vehicle." (Tr. 269). According to Ms. Rashad, Plaintiff's mental impairments limited her ability to work because Plaintiff "goes from extreme euphoria to intense depression and has no control[.] Anxiety, gets mad, upset, suicide [sic], or anger outbursts." (Id.). Ms. Rashad had to remind Plaintiff to take

---

[10] In a third party function report and attached letter, Dawn Rashad stated that she is Plaintiff's legal guardian. (Tr. 269-82). Ms. Rashad explained: "She has been in my care for 5 years. I have took her under my care as her mother, caretaker when she lost her place due to several complaints and repeated police reports." (Tr. 282).

her medicine, shower, change her clothes, and brush her teeth and hair. (Tr. 271, 278). In regard to household chores, Ms. Rashad wrote: "On good days I try to have her help me with mating socks, but she can't match them correctly." (Tr. 278). Ms. Rashad did not allow Plaintiff to keep razors because Plaintiff "self[-]harms" and did not trust her with yard work because she had used yard tools as weapons. (Tr. 278, 275).

Ms. Rashad reported that Plaintiff no longer drove because "her medicine makes her sleepy or she has road rage and anger and spontaneous none judgment [sic] behavior crashes into objects." (Tr. 275). The only places Plaintiff went regularly were her doctor appointments and "sometimes that['s] a struggle." (Tr. 277). Ms. Rashad took Plaintiff to her appointments. (Id.). Plaintiff also had difficulty getting along with others because "she gets into [it] with everyone, thinks they are planning against her . . . Don't like people looking at her." (Tr. 278). Under stress, Plaintiff "starts to cry, feel suicidal thoughts, hurts herself[.]" (Tr. 279). Unusual behaviors included "cutting herself, feeling hopeless like we are against her, very mean, punches herself, bangs her head against walls." (Tr. 279).

In regard to Plaintiff's financial ability, Ms. Rashad stated that Plaintiff did not shop, pay bills, count change, handle a savings account, or use a checkbook. (Tr. 275). Ms. Rashad handled Plaintiff's finances for her because "she has no memory of the bills and dates of things, I am her legal guardian, I handle all her stuff." (Id.).

At Plaintiff's initial appointment with Dr. Brown on April 29, 2010, Dr. Brown noted that Plaintiff suffered ADHD and prescribed Ritalin. (Tr. 862-69). In April 2010 and May 2010, Dr. Brown observed that Plaintiff's affect, attention span, and judgment were "normal," but she found that Plaintiff had "poor insight." (Tr. 866, 858). Hospital records dated August 24, 2010, reflect that Plaintiff was taking Celexa and Ritalin, and records dated September 14, 2010, stated

that Plaintiff suffered "generalized anxiety disorder." (Tr. 508, 303). At an appointment with Dr. Brown on November 2, 2010, Dr. Brown noted that the Ritalin was not controlling Plaintiff's symptoms "throughout [the] day," and she prescribed Adderall. (Tr. 817-20). In December 2010, Dr. Brown found that Plaintiff was positive for "psychiatric symptoms." (Tr. 789).

In May 2011, Dr. Brown found that Adderall was controlling Plaintiff's ADHD. (Tr. 753-58). Medical records reflected Plaintiff exhibited a normal affect in February 2011, March 2011, May 2011, December 2011, March 2012, April 2012, May 2012, and July 2012. (Tr. 773, 768, 756, 552, 381, 389, 461, 730).

In August 2012, Plaintiff visited Dr. Brown for sleep disturbance, and Dr. Brown diagnosed her as "borderline for pathologic sleepiness, multiple symptoms possibly related to anxiety and/or depression." (Tr. 664). In a follow-up appointment with Dr. Brown in September 2012, Dr. Brown noted that Plaintiff's ADHD symptoms were not relieved with medication and Plaintiff was easily distracted and frustrated, made frequent careless mistakes, and was unable to follow directions. (Tr. 710). Dr. Brown noted that Plaintiff exhibited poor insight and judgment on January 25, 2013, and an emergency room doctor diagnosed Plaintiff with generalized anxiety disorder on February 26, 2013. (Tr. 701, 604). At a follow-up appointment with Dr. Brown on July 15, 2013, Dr. Brown found that Plaintiff was chronically depressed and prescribed Cymbalta.[11] (Tr. 684-91).

Dr. Robert Cottone, the state agency physician, completed a psychiatric review technique and mental RFC assessment based upon Plaintiff's medical records. (Tr. 89-90, 100-02). Dr. Cottone diagnosed Plaintiff with organic mental disorders and affective disorders, but found

[11] In August 2013, Dr. Peggy Taylor Boyd became Plaintiff's primary care provider. (Tr. 946). Dr.Boyd's treatment notes, most of which relate to prescriptions, are largely illegible. (Tr. 946-51).

these impairments only mildly limited Plaintiff's activities of daily living, social functioning,[12] and concentration, persistence, and pace. (Tr. 90). Dr. Cottone explained that Plaintiff's mental status exams "have consistently shown normal mood and affect, normal behavior, and normal judgment and thought" and Dr. Brown's treatment notes revealed that Plaintiff "reported good control with Adderall[.]" (Id.). Dr. Cottone concluded that Plaintiff's abilities to understand, remember, and carry out detailed instructions were moderately limited, but concluded that Plaintiff was able to "understand, remember, carry out and persist at simple tasks; make simple work-related judgments; relate adequately to co-workers or supervisors; adjust adequately to ordinary changes in work routine or setting." (Tr. 100-101). Additionally, the ALJ determined that Plaintiff had no social interaction limitations. (Tr. 101).

Dr. Daryl Lindsay performed a psychological evaluation for Plaintiff on October 11, 2014 based upon a one-hour examination with Plaintiff and a review of her medical records. (Tr. 934-43). Plaintiff informed Dr. Lindsay that, as a child in foster care, she received a diagnosis of oppositional defiant disorder and began taking medications for ADHD in third grade. (Tr. 935). Plaintiff described impulsive behavior and road rage, "where she gets out of the car and hits the windows of other drivers[.]" (Tr. 935). Plaintiff described episodes where she is "'up real high' and wants to go 'shopping/steal.' She is 'on top of the earth and wants to do everything nice' and then 'five minutes later [she] is depressed and wants to hurt others and to be left alone.'" (Tr. 935). Plaintiff also discussed with Dr. Lindsay self-harming behaviors "that includes overdose on pills, cutting her wrists and body (showed superficial scars on top of left hand/arm), and punching things, including herself." (Tr. 935). Plaintiff's list of medications prescribed by

---

[12] In his psychiatric review technique, Dr. Cottone noted that Plaintiff's social functioning was "mildly limited," but in his mental RFC assessment, he stated that Plaintiff had no social interaction limitations. (Tr. 90, 101).

14

her new primary care doctor included: Tramadol, Lisinopril-HCTZ, Seroquel, D-Amphetamine, Hydrochlorothiazide, Xanax, and Lithium. (Tr. 935).

Dr. Lindsay diagnosed Plaintiff with the following: borderline personality disorder and "ADHD, predominantly hyperactive/impulsive presentation, moderate." (Tr. 939). Dr. Lindsay noted that Plaintiff's prognosis, with treatment by medication only, was poor, but "[w]ith treatment by medication and appropriate psychological interventions (i.e., dialectical behavior therapy), guarded, as Borderline Personality Disorder is pervasive." (Tr. 939). Dr. Lindsay completed a medical source statement, in which he found Plaintiff: not limited in her ability to carry out simple instructions; mildly limited in her ability to understand and remember simple instructions, make judgments on simple work-related decisions, and understand and remember complex instructions; moderately limited in her ability to carry out complex instructions; and markedly limited in her ability to make judgments on complex work-related decisions. (Tr. 941). In regard to Plaintiff's social functioning, Dr. Lindsay determined that she was markedly limited in her ability to interact with the public and respond appropriately to usual work situations and to changes in routine and extremely limited in her ability to interact appropriately with supervisors and co-workers. (Tr. 942).

Dr. Almas Rahman completed a psychological evaluation for Plaintiff on November 11, 2014. (Tr. 954- 59). Plaintiff informed Dr. Rahman that, as a child, she was sexually and mentally abused and suffered "defiance problems." (Tr. 954). Plaintiff described "episodic anxiety, says she does not know why, says she has a BAD TEMPER and does NOT DRIVE because of 'ROAD RAGE.' States that her MANIC episode is when she GETS MAD and explodes, has low frustration TOLERANCE[.]" (Id.) (emphasis in original). Plaintiff also informed Dr. Rahman that "she goes to pay day loans, gets the loan from them and then goes

gambling at the boats. Says she will also steal things from stores, then will take them back to the store and will get a GIFT CARD for them." (Id.) (emphasis in original). Dr. Rahman noted that Plaintiff exhibited "flight of ideas," "tangentiality," "paranoid ideas," and delusions. (Tr. 955). He diagnosed her with: bipolar disorder, depressed with psychotic features; PTSD; and borderline personality disorder, severe. (Id.). Dr. Rahman assigned Plaintiff a GAF score of 42.[13] (Id.).

In reviewing the medical opinion evidence, the ALJ found that Dr. Cottone's "unskilled work finding is supported by the lack of mental health treatment in the record." (Tr. 26). Because Dr. Cottone did not include any social limitations, "which are appropriate considering the claimant's diagnosis of a personality disorder," the ALJ assigned that opinion "some weight." (Id.).

The ALJ granted less weight to the opinion of Dr. Lindsay, the consultative examiner. (Id.). The ALJ disagreed with Dr. Lindsay's determination that Plaintiff had "extreme limitations with interacting with others because of 'extreme' mood swings." (Id.). The ALJ explained: "[T]his extreme social interaction finding is contradicted by the claimant's cooperative and pleasant nature during Dr. Lindsay's own examination," her "pleasant and

---

[13] A GAF score represents a clinician's judgment of an individual's overall ability to function in social or occupational settings, not including impairments due to physical or environmental limitations. Diagnostic & Statistical Manual of Mental Disorders (4th ed.) (DSM-IV) at 32. GAF scores of 31-40 indicate some impairment in reality testing or communication or "major" impairment in social or occupational functioning. The Court notes that DSM–V was released in 2013 and replaced the DSM–IV. The DSM–V "no longer uses GAF scores to rate an individual's level of functioning because of 'its conceptual lack of clarity' and 'questionable psychometrics in routine practice.'" Alcott v. Colvin, No. 4:13–CV–01074–NKL, 2014 WL 4660364, at *6 (W.D. Mo. Sept. 17, 2014) (citing Rayford v. Shinseki, 2013 WL 3153981, at *1 n.2 (Vet. App. 2013) (quoting the DSM–V)). However, because the DSM–IV "was in use when the medical entries were made and the [ALJ's] decision was issued in this matter, the Global Assessment of Functioning scores remain relevant for consideration in this appeal." Rayford, 2013 WL 3153981, at * 1 n.2.

16

cooperative" demeanor during the hearing, and "other examinations where the claimant presented with a normal mood and affect." (Id.). Additionally, the ALJ discredited Dr. Lindsay's opinion because "[h]e appears to rely on the subjective reports of the claimant for his conclusion, as there is no evidence in the record to support extreme mood swings other than the claimant's reports." (Id.). The ALJ therefore assigned Dr. Lindsay's opinion "little weight." (Id.).

In discussing Dr. Rahman's medical opinion, the ALJ noted that, although Dr. Rahman gave Plaintiff a GAF score of 42, "his actual assessment and mental status examination found the claimant logical with average intelligence, no suicidal or homicidal ideations, no visual or auditory hallucinations and with objectively normal findings on mental status examination[.]" (Tr. 27). The ALJ discredited Dr. Rahman's GAF score because "the claimant's actual presentation as reflected in the mental status exam correlates well with her presentation at her consultative examination and the disability hearing itself, which paint a more positive picture of both the claimant's current mental status and her future capabilities[.]" (Id.). The ALJ concluded: "Thus, the undersigned gives little weight to the doctor's GAF score of 42." (Id.). Based on the medical records and testimony, as well as his own observations of Plaintiff during the hearing, the ALJ included the following nonexertional limitations in the RFC: "The claimant's work is limited to simple unskilled (SVP 1 or 2) work, with no public contact work, and no more than occasional and superficial contact with supervisors and co-employees." (Tr. 23).

Plaintiff argues that the ALJ erred by giving some weight to the opinion of the non-examining, state agency psychological consultant, Dr. Cottone, while discrediting the opinions of Drs. Lindsay and Rahman. As the ALJ observed, Dr. Cottone found that Plaintiff could perform

17

unskilled work. (Tr. 26). The ALJ found that Dr. Cottone's findings were consistent with the medical evidence, which generally showed normal mental status examinations and a lack of mental health treatment. (Id.). The ALJ only accorded his opinion some weight, however, because Dr. Cottone failed to consider Plaintiff's personality disorder and resulting limitations. (Id.). The Court finds the ALJ provided sufficient reason to assign Dr. Cottone's opinion some weight.

The Court also finds that the ALJ gave valid reasons for discrediting Dr. Lindsay's and Dr. Rahman's medical opinions. The ALJ granted Dr. Lindsay's opinion "little weight" because Dr. Lindsay relied heavily on Plaintiff's "subjective reports." (Tr. 26). See McCoy v. Astrue, 648 F.3d 605, 616-17 (8th Cir. 2011) (ALJ may reject a medical opinion if it is "inconsistent with the record as a whole" or "based, at least in part, on [the claimant's] self-reported symptoms" where the claimant is deemed not credible).

In discussing Dr. Rahman's opinion, the ALJ explained that the GAF score of 42 was not consistent with Dr. Rahman's "actual assessment and mental status examination[.]" (Tr. 27). The ALJ also noted that, according to the SSA, GAF scores "are mere 'snapshots' and not standardized (they vary from clinician to clinician)[.]"[14] (Id.). The ALJ properly considered Plaintiff's GAF score in light of the SSA's position on GAF and the Dr. Rahman's entire evaluation.[15] See, e.g., Myers v. Colvin, 721 F.3d 521, 525 (8th Cir. 2013) (internal citation

---

[14] "GAF scores may be relevant to a determination of disability based on mental impairments." Mabry v. Colvin, 815 F.3d 386, 391 (8th Cir. 2016) (citing Pates–Fires v. Astrue, 564 F.3d 935, 944–45 (8th Cir. 2009)). However, "[i]n recent years, the [SSA] has recognized, and we have noted, that GAF scores have limited importance." Nowling v. Colvin, 813 F.3d 1110, 1115 n.3 (8th Cir. 2016) (citing Jones v. Astrue, 619 F.3d 963, 973–74 (8th Cir. 2010)).

[15] Plaintiff appears to argue for remand on the ground that the ALJ only considered the GAF score assigned by Dr. Rahman and failed to specify the weight given Dr. Rahman's opinion as a whole. Although ALJs must consider opinions in the record, the ALJ is not required to discuss every piece of evidence submitted. Wildman, 596 F.3d at 966. "[A]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." Id. The ALJ's

18

omitted) ("Although the SSA does not consider GAF scores to 'have a direct correlation to the severity requirements,' we have considered GAF scores in reviewing an ALJ's determination that a treating source's opinion was inconsistent with the treatment record.").

Plaintiff further argues that the ALJ did not base the mental RFC determination on substantial evidence in the record. According to Plaintiff, the ALJ's decision "is based upon plaintiff's lack of mental health treatment in the record (opinion of Dr. Cottone), the ALJ's observations at the hearing, and her presentation at the consultative exam." (ECF No. 18 at 8). In other words, Plaintiff alleges that the ALJ based his decision upon his own inferences rather than medical evidence. The Commissioner counters that the ALJ properly based the RFC on all the evidence of record.

Although the ALJ bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence, "a claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001) (quoting Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000)). See also Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001). "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." Hensley v. Colvin, 829 F.3d 926, 932 (8th Cir. 2016) (quoting Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007)). "An administrative law judge may not draw upon his own inferences from medical reports." Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000). See also Pratt v. Sullivan, 956 F.2d 830, 834 (8th Cir. 1992) (per curium) (it is reversible error for an ALJ to substitute his own unsubstantiated conclusion concerning a mental impairment for the express diagnosis of an examining psychiatrist).

discussion of the GAF score assigned by Dr. Rahman demonstrates that the ALJ considered Dr. Rahman's evaluation. Thus, the ALJ's failure to specify the weight afforded to Dr. Rahman's opinion does not require remand.

In Nevland v. Apfel, the United States Court of Appeals for the Eighth Circuit reversed an ALJ's denial of benefits because "[t]he ALJ relied on the opinions of non-treating, non-examining physicians who reviewed the reports of the treating physicians to form an opinion of [the claimant's] RFC." 204 F.3d at 858. The Court stated: "The opinions of doctors who have not examined the claimant ordinarily do not constitute substantial evidence on the record as a whole." Id. (citing Jenkins, 196 F.3d at 925). Although a non-examining physician's opinion might constitute sufficient evidence at step four of the sequential analysis, when the claimant has the burden to prove she cannot do past relevant work, it is not sufficient at step five, where the Commissioner must prove that the claimant retains the RFC to do other jobs existing in the national economy. Id. ("[T]he testimony of a vocational expert who responds to a hypothetical based on such evidence is not substantial evidence upon which to base a denial of benefits.").

Here, the only medical evidence relating specifically to Plaintiff's ability to work was the reports of Dr. Lindsay and Dr. Cottone. The ALJ assigned little weight to Dr. Lindsay's determination that Plaintiff was markedly limited in her ability to interact with the public and respond appropriately to usual work situations and extremely limited in her ability to interact with supervisors and coworkers. (Tr. 26). Although the ALJ questioned Dr. Cottone's finding that Plaintiff had no social interaction limitations, he nevertheless gave Dr. Cottone's opinion some weight. (Id.). Thus, the only medical opinion evidence suggesting that Plaintiff had the mental RFC to function in the workplace, even with limitations, was Dr. Cottone's report. As previously discussed, Dr. Cottone never examined Plaintiff and based his RFC opinion solely upon Plaintiff's medical records.

There must be "[s]ome medical evidence" to "support the determination of a claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to

function in the workplace." Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004) (internal citation omitted). Upon review of the record, it appears the ALJ based the mental RFC either upon the non-examining doctor's opinion or upon the ALJ's own inferences from medical reports and personal observations, neither of which constitutes medical evidence. See Nevland, 204 F.3d at 858. Because some medical evidence in the record did not inform and support the ALJ's RFC assessment, the Court remands for reconsideration of this issue.

## *IV.* *Conclusion*

For the reasons set forth above, the court finds that the Commissioner's decision was not supported by substantial evidence. Accordingly,

**IT IS HEREBY ORDERED** that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner is **REVERSED**, and this cause is **REMANDED** to the Commissioner for further proceedings consistent with this opinion.

An order of remand shall accompany this memorandum and order.

_Patricia L. Cohen_
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 24th day of February, 2017